IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | : | CIVIL ACTION |
| AS TRUSTEE, SUCCESSOR-IN- | : | |
| INTEREST TO BANK OF AMERICA, | : | No. 12-4550 |
| N.A., AS TRUSTEE, SUCCESSOR TO | : | |
| WELLS FARGO BANK, N.A., AS | : | |
| TRUSTEE, FOR THE REGISTERED | : | |
| HOLDERS OF GS MORTGAGE | : | |
| SECURITIES CORPORATION II, | : | |
| COMMERCIAL MORTGAGE PASS- | : | |
| THROUGH CERTIFICATES, SERIES | : | |
| 2007-GG10 | : | |
| | : | |
| v. | : | |
| | : | |
| JGKM ASSOCIATES LLC | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **March 31, 2015**

      Plaintiff, U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor to Wells Fargo Bank, N.A., as Trustee, for the registered holders of GS Mortgage Securities Corporation II, Commercial Mortgage Pass-Through Certificates, Series 2007-GG10 (U.S. Bank) brings suit against Defendant JGKM Associates LLC (JGKM) for defaulting on a commercial loan secured by a mortgage. U.S. Bank seeks an order of foreclosure on the mortgage for the amount due under the note. A non-jury trial was held on April 15-16, 2013, and both parties submitted findings of fact and conclusions of law.[1] For the following reasons, the Court will enter judgment for U.S. Bank in an amount to be determined after a hearing on the damages.

---

[1] On September 23, 2013, JGKM filed a suggestion of bankruptcy, and the Court thereafter placed this case in suspense. On December 17, 2014, the stay was lifted pursuant to an Order of the U.S. Bankruptcy Court granting U.S. Bank's motion for relief from the automatic stay and holding that U.S. Bank may resume its efforts to obtain a judgment of foreclosure in this case.

**BACKGROUND**

On January 19, 2007, Greenwich Capital Financial Products, Inc. (Original Lender) made a commercial loan (the Loan) to JGKM in the principal amount of $32 million. The Loan is evidenced by a Promissory Note and secured by a Mortgage on the Property owned by JGKM (the Property) effective January 19, 2007, both of which JGKM executed in favor of Original Lender "together with its successors and assigns." Ex. 1, Promissory Note 1; Ex. 2, Mortgage 1.[2] JGKM also executed in favor of Original Lender "together with its successors and assigns" a Loan Agreement dated January 19, 2007. Ex. 3, Loan Agreement 1.

The Loan was securitized pursuant to a Pooling and Services Agreement (PSA) dated July 1, 2007. Ex. 62. The PSA identified Wells Fargo Bank, N.A. as trustee and CWCapital Asset Management LLC (CWCapital) as the special servicer for the loans comprising the securitization. Effective July 10, 2007, the Original Lender assigned the Loan to Wells Fargo, N.A., as trustee. Exs. 6, 7, 8. On March 31, 2009, Wells Fargo assigned the Loan to Bank of America, N.A., and Bank of America became the trustee for the pool of loans. Exs. 9, 10. In May 2012, Bank of America assigned the Loan to U.S. Bank, Plaintiff in this case. Exs. 13, 14, 15. Wells Fargo serves as the master servicer of the Loan.[3]

In 2008, the Loan was transferred to CWCapital for special servicing because of JGKM's payment default. Alexander Killick, asset manager of CWCapital, was assigned to modify the

---

[2] The Property is owned by JGKM and known as Pavilion at Lansdale or the Lansdale Pavilions Shopping Center, with an address of 401-611 South Broad Street, in Lansdale, Pennsylvania.

[3] Exhibit 62 (the PSA) and Exhibit 5 (the mortgage loan purchase agreement pursuant to the PSA) both identify Wachovia Bank, N.A., as the master servicer and Wells Fargo as only the trustee. In 2008, Wells Fargo acquired Wachovia Corporation, and all Wachovia accounts were moved to Wells Fargo. Therefore, beginning in 2008, Wells Fargo acted as both the master servicer and the trustee, until U.S. Bank replaced Wells Fargo as trustee in 2012 and Wells Fargo remained as the master servicer. *See* Trial Tr. 113, 114, 135, Apr. 15, 2013 (asset manager of the Loan repeatedly referring to Wells Fargo as the master servicer).

Loan. Killick's job was to review the trustee file, determine an appropriate strategy, and present the strategy to the credit committee, which had ultimate responsibility to approve modifications. Trial Tr. 39, Apr. 15, 2013. Killick stated he did not have the ability to bind the trust on his own, and the credit committee had to approve any modifications. *Id.* 48. He and Bruce Kaplan, Chief Financial Officer of JGKM, communicated about potential modification of the Loan, and a Modification Agreement became effective December 15, 2010. Ex. 12, Modification Agreement.

The Modification Agreement split the unpaid principal into two groups, Tranche A and Tranche B, and required JGKM to make monthly payments of interest on these two Tranches on each payment date (the 6th day of every calendar month). The Modification Agreement provided for forgiveness of the Tranche B principal in the event JGKM complied with the terms of the Loan Documents (the Note, Mortgage, Loan Agreement, and Modification Agreement), including making the required payments of interest on the Tranche A and Tranche B principal, monthly delinquency payments, and reserves for taxes and insurance.

Pursuant to the Modification Agreement, tenants of the Property deposit their rental payments into a "lockbox" account. The account is "swept" daily to a cash management account controlled by the master servicer who then distributes the money in accordance with a waterfall of payments. Under the waterfall, the order of priority of the payments for the Loan is: (1) funding for taxes and insurance premiums, (2) fees, (3) operating expenses, (4) interest on the Tranche A principal, (5) any unpaid interest on or unpaid payments due under the Tranche A principal, (6) monthly delinquency payments of $25,000, and (7) interest due and any unpaid interest or payments due under the Tranche B principal. Ex. 12, Modification Agreement 10-11, § 5(b)(xi). Section 5(b)(xii) of the Modification Agreement specifically provides that "[t]he insufficiency of funds on deposit in the Deposit Account shall not relieve Borrower from the

3

obligation to make any payments as and when due under the terms of the Loan Documents, and the failure of Borrower to make all of the payments required under [the waterfall] in full on each Payment Date shall constitute an Event of Default under this Agreement." *Id.* at 11, § 5(b)(xii). Section 9 of the Modification Agreement provides that in the event of a default by JGKM, JGKM consents to the appointment of a receiver and the conveyance of title to the Property from JGKM to the Lender. *Id.* at 13-14, § 9.

In addition, as part of the Modification Agreement, Joseph Grasso, JGKM's principal and guarantor, personally guaranteed $15 million for the Loan, which correlates to the amount of debt on the Tranche A principal. Trial Tr. 17, Apr. 16, 2013.

The sweeps of the lockbox commenced immediately after the execution of the Modification Agreement in December 2010, and the Loan was transferred back to the master servicer at some point in 2011. The sweeps, however, did not cover the full amount due under the Loan, *id.* at 186-87, 67, and the Loan was transferred back to CWCapital for special servicing a second time for payment default in March 2012, *id.* at 67, 119, 132. Killick was again assigned to the Loan and confirmed the Loan was in default under the new Modification Agreement. *Id.* at 68-69. By letter dated May 11, 2012, CWCapital, acting in its capacity as special servicer, sent a Notice of Default to JGKM, stating that JGKM had failed to pay in full the monthly interest payment, tax and insurance monthly deposits, monthly delinquency payments, and delinquent amounts that accrued as a result every month from January through May of 2012. Ex. 16. CWCapital also sent a Notice of Acceleration on May 21, 2012, stating that the entire amount of the debt was due and owing immediately. Ex. 17. In June 2012, Grasso offered to pay U.S. Bank $15 million to purchase the Loan, but U.S. Bank declined. U.S. Bank filed this lawsuit in August 2012, and this Court appointed a Receiver on September 12, 2012.

4

## DISCUSSION

### 1. Default

In a civil case the burden of proof is the same whether by bench trial or jury: Every element must be proved by a preponderance of the evidence, or, in other words, the matter asserted must be shown to be more likely true than not true. For a mortgage foreclosure action, "the plaintiff must show the existence of an obligation secured by a mortgage, and a default on that obligation." *Chem. Bank v. Dippolito*, 897 F. Supp. 221, 224 (E.D. Pa. 1995). Here, JGKM does not dispute the validity of the Loan Documents (the Promissory Note, Mortgage, Loan Agreement, and Modification Agreement), and it concedes it failed to make the required monthly payments pursuant to the Loan Documents beginning in January 2012. "Upon default, the holder of a mortgage can legally proceed to enforce the terms of the mortgage either by foreclosure proceedings or by obtaining judgment on the bond accompanying the mortgage and issuing a writ of execution." *Cunningham v. McWilliams*, 714 A.2d 1054, 1056-57 (Pa. Super. Ct. 1998) (citing *Elmwood Fed. Sav. Bank v. Parker*, 666 A.2d 721, 724 n.6 (Pa. Super. Ct. 1995)). Because JGKM has defaulted on its obligations under the Loan Documents, U.S. Bank is entitled to judgment.[4]

---

[4] As U.S. Bank correctly points out, separate and apart from JGKM's monthly payment default, JGKM defaulted on its obligations under the Loan Documents on two separate additional grounds: (1) failure to pay delinquent school board taxes for the year 2008, and (2) Grasso's filing of personal bankruptcy on February 6, 2012.

As to the school board tax default, one of JGKM's post closing obligations under the Modification Agreement included the payment of two separate tax obligations. *See* Ex. 12, Modification Agreement 12, § 8(a)(i), (ii). The first payment was to reimburse the master servicer for the past due taxes that it had advanced in the amount of $407,609.77, *see id.* § 8(a)(i), and the second was to be paid directly to the Montgomery County Tax Claim Bureau for unpaid borough, county, and school taxes for the years 2007 and 2008, *see id.* § 8(a)(ii). Joseph Grasso made the $407,609.77 payment in April 2011 (two months later than agreed). Killick testified, however, that in August 2012 he was informed by a third party that the 2008 school board taxes were delinquent and, in fear that the property would be sold free and clear of

JGKM argues it is not in default even though it consistently failed to make the required monthly payments beginning in January 2012 because the special servicer and lender at the time (Bank of America)[5] (1) waived or implicitly waived the right to default and/or (2) modified the terms of the Loan by repeatedly tolerating late payments without declaring default.[6]

---

the lien, CWCapital arranged to have the master servicer advances funds to pay these taxes in the amount of $137,055.84 by check dated August 9, 2012. Trial Tr. 74-78, Apr. 15, 2013. Killick stated it was his understanding that this payment was for the 2008 tax bills that were covered by § 8(a)(ii) of the Modification Agreement. *Id.* at 78. The Modification Agreement specifies that "[a]ny default by Borrower in the performance of any Post Closing Obligations shall constitute . . . an Event of Default under the Loan Documents." *See* Ex. 12, Modification Agreement 13, § 8(b). Therefore, JGKM's failure to pay the school board taxes is a separate Event of Default.

As for Grasso's personal bankruptcy, the Loan Agreement provides that an Event of Default exists with respect to the Loan if "any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law . . . shall be filed by or against, consented to, or acquiesced in by, Borrower, SPE Party or Guarantor, as the case may be." Ex. 3, at 62, §8.1(g). The Loan Agreement defines "SPE Party" and "Guarantor" as Joseph Grasso. *Id.* at 4, §1.1; 11, § 1.1. On February 6, 2012, Grasso filed a Voluntary Petition in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania captioned *In re Joseph Grasso*, No. 12-11063. Ex. 19. Grasso's personal bankruptcy filing entitles U.S. Bank to a judgment in foreclosure, even if the plan of reorganization in Grasso's bankruptcy reaffirms his obligations to U.S. Bank, as JGKM argues.

[5] Plaintiff in this case is U.S. Bank, who was assigned the Loan from Bank of America in May 2012. Bank of America was the lender when the Loan went into default and when it was transferred back to CWCapital for special servicing in March 2012. An assignee of a contract (here, U.S. Bank) receives a contract subject to all the defenses of its assignor (Bank of America), and an assignee's rights against the obligor (JGKM) is subject to all the limitations of the obligee's (Bank of America) rights. *See Peoples Pitts. Trust Co. v. Commonwealth*, 60 A.2d 53, 56 (Pa. 1948) (citations omitted). ("An assignee's right against the obligor is subject to all limitations of the obligee's right, to all absolute and temporary defenses thereto, and to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided that such defenses and set-offs are based on facts existing at the time of the assignment."). Therefore, if there were any changes to Bank of America's rights as lender, those changes would be enforceable against U.S. Bank when Bank of America assigned the Loan to it. Unless specifically referring to U.S. Bank, the Court will hereinafter refer to Bank of America, or any other lender on the loan, generically as the "lender."

[6] U.S. Bank asserts that because waiver and estoppel are affirmative defenses under Federal Rule of Civil Procedure 8(c) that must be raised in responding to a pleading and JGKM failed to raise its waiver and estoppel defenses before summary judgment, it has waived these defenses. The Court finds, however, even if JGKM has not waived these defenses, they are without merit.

A waiver is the intentional relinquishment of a known right, which requires "a clear, unequivocal, and decisive act of the party with knowledge of the right and an evident purpose to surrender it." *Commonw. ex rel. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008) (citing *Brown v. Pittsburgh*, 186 A.3d 399, 401 (Pa. 1962)). To find an implied waiver of a known right, the court must find that the circumstances are adequate to estop the lender and that the borrower relied on the lender's conduct and was thereby prejudiced. *See Consol. Rail Corp. v. Del. & Hudson Ry. Co.*, 569 F. Supp. 26, 29-30 (E.D. Pa. 1983); *see also Schuylkill Prods., Inc. v. H. Rupert & Sons, Inc.*, 451 A.2d 229, 233 (1982) ("An estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." (citations and internal quotation marks omitted) (emphasis omitted)).

JGKM failed to pay the full the monthly payment amount under the Modification Agreement beginning in January 2012, and instead took money from the next month's funds to cover the previous month's mortgage payment. Trial Tr. 37, 49, Apr. 16, 2013. In April 2012, three months after the Loan went into default and after the Loan was transferred back to CWCapital for special servicing for a second time, JGKM began diverting funds from the lockbox to perform improvements on a space for a prospective new tenant. JGKM argues the lender and Killick[7] were completely aware of and agreed to the diversion of funds to

---

[7] During the period of time between the execution of the Modification Agreement in December 2010 and the return of the Loan to the master servicer several months later, Killick, acting on behalf of the special servicer, was in control of the account and applied funds swept from the lockbox to JGKM's required monthly payments. Once the Loan was transferred back to the master servicer, CWCapital was no longer in charge of sweeping the account and the master

construction because "it was the best thing for the shopping center." *Id.* at 38. As proof that Killick and the lender knew about the diversion of funds, JGKM points to the drop of the lockbox's rental income in April 2012 and the fact CWCaptial sent a site inspector to the property who must have observed the construction. Because the lender and Killick knew about and agreed to JGKM's reallocation of the rental payments to constructive costs, JGKM argues they intentionally waived the lender's right to default. JGKM alternatively asserts the lender's and Killick's conduct was an implied waiver of its right to hold JGKM in default because they were aware of the use of the funds for improvement and did not object to that use, and JGKM would be prejudiced if U.S. Bank could now retract the waiver because U.S. Bank would receive the benefit of the improvements in addition to collecting on all the unpaid payments that were used for the improvements.

None of these alleged actions on the part of the lender or Killick constitute a waiver, intentional or implied, of the lender's rights. During the trial, Killick denied knowing about or agreeing to the diversion of rental payments from the lockbox to tenant improvements. Trial Tr. 69, Apr. 15, 2013. Even if Killick had known about the diversion, however, he did not have authority to approve such a diversion of funds or otherwise modify the Loan. Rather, all changes to the Loan had to be approved by the credit committee at CWCapital. *Id.* at 47-48. Further, the record reflects that all communications about the Loan or any late payments were between JGKM and Killick. Killick stated he did not receive any direction from the lender concerning either the Loan or the May declaration of default, *id.* at 119, and Kaplan did not communicate with any employee of the lender with respect to the Loan, *id.* at 213. Thus all of JGKM's

---

servicer controlled the funds. Then, in March 2012, the Loan was transferred back to special servicing and Killick again handled the Loan. JGKM asserts both the lender and Killick acting as special servicer waived the right to default and modified the terms of the Loan.

communications about the loan were with a special servicer asset manager who had no authority to waive any of the lender's rights.

In addition, the Loan Documents expressly provide that the terms of the Loan cannot be waived or modified by inaction or delay on the part of the Lender and any such waiver or modification must be in writing to be effective. *See, e.g.*, Ex. 1, Promissory Note 4, § 7; Ex. 2, Mortgage 9, § 10(h); Ex. 3, Loan Agreement 64-65, § 8.2.4, 73 § 10.8; Ex. 12, Modification Agreement 15, § 14; 16, § 15(c). At trial, JGKM failed to produce any signed or written instrument from U.S. Bank, or previous lenders, reflecting any waiver or modification of the Loan Documents. In fact, Kaplan, the person in charge of the Loan for JGKM, conceded that there is not a single written communication between him and Killick in which Kaplan makes reference to the use of rental income for alleged tenant improvements. Trial Tr. 206, April 15, 2013. In addition, the record reflects that Killick made JGKM expressly aware that acceptance of late payments did not modify the Loan in any way. In emails from February 2011 (roughly one year before the Loan went into default), Killick advised JGKM that the "decision to accept funds swept after the payment due date of the 6th should not be construed as a course of dealing or expectation that late funds will be accepted in the future," Ex. 35, and "once this loan goes back to the [master servicer], all funds will need to be in place in time for the payment due date of the 6th of the month," Ex. 30.

Thus, there is simply no evidence of any affirmative act or declaration by the lender waiving its right to declare a payment default under the Loan Documents. *See Caring People Alliance v. Educ. Data Sys., Inc.*, No. 07-1267, 2008 WL 4441994, at *9 (E.D. Pa. Sept. 29, 2008) ("Without an affirmative act or declaration waiving the right to make a particular choice, we cannot imply such a waiver from a course of performance consistent with the four corners of

9

the contract."). As to implied waiver, there is no evidence JGKM was induced to believe by Killick's or the lender's actions that the lender was waiving its right to declare default. The Loan Documents make very clear that any waiver had to be in writing, and in light of these clear mandates which appear in each one of the Loan Documents, JGKM could not "rightfully" act on any alleged belief regarding waiver. *See Schuylkill Prods.*, 451 A.2d at 233.

JGKM's second argument—that the lender modified the terms of the Loan by its course of conduct—is barred not only by the mandate of the Loan Documents that all modifications must be in writing, but also by the Statute of Frauds.[8] Under Pennsylvania law, mortgages constitute interests in land, and as such, the Statute of Frauds requires any modification of those mortgages to be in writing. *See* 33 Pa. Cons. Stat. Ann. § 1 (Pennsylvania's Statute of Frauds); *Strausser v. PRAMCO, III*, 944 A.2d 761, 765 (Pa. Super. Ct. 2008) ("An agreement to forbear from foreclosure, between mortgagor and mortgagee, has been held to represent an interest in land such that the agreement is subject to the Statute of Frauds and must be in writing."); *see also Phoenix Four Grantor Trust #1 v. 642 N. Broad St. Assocs.*, No. 00-597, 2000 WL 876728, at *5 (E.D. Pa. June 29, 2000) ("[B]ecause the mortgages constitute interests in land, under . . . Pennsylvania law, the statute of frauds requires any modification of those mortgages to be in writing." (*citing Linsker v. Sav. of Am.*, 710 F. Supp. 598, 600 (E.D. Pa. 1989)); *Dollar Dry Dock Bank v. Penn Ctr. W. Assocs.*, No. 90-6455, 1992 WL 70411, at *3 (E.D. Pa. Mar. 31, 1992)

---

[8] JGKM argues that a court can find evidence of an agreed modification from "a course of performance by one party accepted or acquiesced in without objection by the other." *Agathos v. Starlite Motel*, 977 F.2d 1500, 1509 (3d Cir. 1992) (citing Restatement (2nd) of Contracts § 202(4) & cmt. g (1981)). This rule applies if one party repeatedly performs in a way that would be objectionable under the original contract and the other party, with knowledge of the nature of the performance and opportunity for objection, fails to object. *See id.* However, *Agathos* concerned a collective bargaining agreement not covered by the Statute of Frauds, whereas this case involves a contract for an interest in land, which is covered.

(addressing borrower's argument that there was an oral agreement with its lender to forbear from foreclosing on its property for ninety days and finding "[e]ven assuming, *arguendo*, that there was an implied promise to forbear for ninety days, such a promise is made unenforceable by the Pennsylvania Statute of Frauds."); *Atl. Fin. Fed. v. Orianna Historic Assocs.*, 594 A.2d 356, 358 (Pa. Super. Ct. 1991) (rejecting borrower's argument that its course of dealing with the borrower meant the Statute of Frauds should not apply and the court should recognize an agreement by the lender to forbear).

As discussed above, there is no evidence of anything in writing modifying the terms of the Loan. The lender's prior accommodation to JGKM in the months following the execution of the Modification Agreement does not create a binding commitment by the lender to forebear in the future, and JGKM cannot evade the Statute of Frauds by relying on an alleged course of conduct. *See Strausser*, 944 A.2d at 766 (refusing to infer any agreement from lender's prior forbearance as the lender's acceptance of late payments was "no more than evidence of a lender attempting to accommodate a struggling homeowner").[9]

---

[9] JGKM also asserts that U.S. Bank has unclean hands because it acted in bad faith in inducing JGKM to divert rental payments to property improvements and then foreclosing on the property, thereby giving it the benefit of the rental payments in the form of improvements on the property without having to deduct them from the balance due on the Loan. As evidence of this bad faith, JGKM points to U.S. Bank's refusal to accept Grasso's $15 million offer to pay off tranche A of the Loan and U.S. Bank's intentional delay in foreclosing on the property.

First, a lender has no obligation to renegotiate or modify a loan at the borrower's request, and U.S. Bank's refusal to accept Grasso's offer was not bad faith. *See, e.g.*, *F.D.I.C. v. Altholtz*, 4 F. Supp. 2d 80, 88-89 (D. Conn. 1998) (rejecting defense of unclean hands in foreclosure action based upon "plaintiff's failure to accept the defendants' settlement offer"); *see also J&S Assocs. Trust v. LaSalle Nat'l Bank*, No. 99-4956, 2001 WL 1143319, at *7 (E.D. Pa. Sept. 27, 2001) ("[A]s lender, defendants were not required to modify the existing loan documents at [borrower's] request."); *Curry v. Bank of Am. Home Loans Servicing*, 802 F. Supp. 2d 105, 109-08 (D.D.C. 2011) (holding that lender was free to refuse loan modification for any reason "or indeed for no reason at all"), *aff'd sub nom. Curry v. Bank of Am. Home Loans Servicing L.P.*, 466 F. App'x 12 (D.C. Cir. 2012).

## 2. Damages

Given that this case was suspended for fifteen months, the Court is not prepared to rule on U.S. Bank's requested damages amount, but writes to note areas of concern the parties should be prepared to address at the damages hearing on April 30, 2015.

During the trial, U.S. Bank submitted a spreadsheet itemizing the damages from (1) Tranche A Unpaid Principal Balance (UPB), (2) Tranche B UPB, (3) Tranche A Accrued Interest from 12/6/11 to 4/9/13, (4) Tranche A Default Interest from 1/6/11 to 4/9/13, (5) Outstanding Tax Advance, (6) Lender's Expenses, (7) Tranche A Payment Consideration, and (8) Delinquent Payments Per § 4.b of Modification Agreement. *See* Ex. 20. Against these damages, U.S. Bank credited a reserve balance of $10.25 and an Operating Account of $200,000. *See id.* U.S. Bank submitted a spreadsheet supporting the "Lender's Expenses" amount, Ex. 22, and relied on Killick's testimony to substantiate the remaining amounts, Trial Tr. 84-100, Apr. 15, 2013. According to U.S. Bank, the total amount due as of the April 2013 was $38,453,778.94.

---

Further, there is no evidence of a purposeful delay on the part of the lender. Killick testified he was not in communication with the lender about the default on the Loan, Trial Tr. 119, Apr. 15, 2013, and he issued the May 11, 2012, letter of default about two months after receiving the Loan back from the master servicer in March 2012. Killick also testified that when the Receiver was appointed in September 2012, four months after the notice of default was issued, the area under construction "was in a terrible state, nowhere near ready for the tenant. The tenant actually incurred a significant rent credit for the late delivery of the space caused by the general poor state of the buildout. And the Receiver—I feel like we were lucky that the Receiver was able to fix that situation and that we didn't lose the tenant entirely." *Id.* at 152. Although Kaplan testified that, as he understood it, between 75% and 80% of the construction project was completed when the Receiver was appointed, *id.* at 186, it appears the project still required a significant amount of work and the rental income was reduced even more due to the delay of its completion. Because of the short amount of time between the transfer of the Loan to special servicing and the declaration of default, the lack of communication between the lender and the special servicer, and the reduction of rental income after the Receiver appointment, the Court finds the doctrine of unclean hands is not applicable.

During trial JGKM argued that U.S. Bank failed to prove that its calculations were correct and focused on the fact that rental payments were swept from the lockbox by both CWCapital and the Receiver from January 2012 to April 2013, resulting in a total collection of $1,596,195.64. Ex. 61. JGKM asserted U.S. Bank had not explained how it used that money and these payments should have been credited to the interest on Tranche A, thereby reducing the damages amount.

Pursuant to the Loan Agreement and the Modification Agreement, payments collected after default (in this case, January 2012 and onward) can be applied to the Loan at the lender's discretion. Ex. 3, Loan Agreement 17, § 2.3.1; Ex. 12, Modification Agreement 8, § 4. Killick stated that as asset manager for the special servicer he had discretion to apply the funds received from the sweeps as advances to the Receiver and delinquent tax escrows, Trial Tr. 161, Apr. 15, 2013, and that he posted $136,000 to a delinquent tax request and wired $75,000 to Receiver for emergency bills in September 2012, *id.* It is unclear, however, how the remaining $1,385,195.64 was spent, and at the damages hearing, U.S. Bank should be prepared to justify the use of the money swept from the lockbox from January 2012 onward.

In addition, the Court finds U.S. Bank has not sufficiently proven the amount it lists as the Outstanding Tax Advance. At trial Killick stated the amount included the $137,055.84 for the unpaid 2008 school board taxes and other "taxes that lenders had to fund," *id.* at 85, but U.S. Bank failed to explain what these "other taxes" were. It is also not clear why U.S. Bank estimated the Outstanding Tax Advance as $206,430.80 in January 23, 2013, for purposes of its Motion for Summary Judgment, *see* Affidavit of Alexander M. Killick, Pl.'s Mot. for Summ. J., but this number had increased to $277,570.88 by the date of trial in April 2013. Unless U.S. Bank can justify this amount, the Court will reduce the damages award by $140,515.04, which is

the difference between the requested Outstanding Tax Advance and the amount paid to the school board for the 2008 taxes.

Both parties shall submit updated damages exhibits and address the deficiencies noted above at the damages hearing.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.